RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 06a0130p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

WILLIAM BRISCOE; LAURA FARLEY; HAROLD
SMITH; LAWRENCE SMITH; MICHAEL R. STRAKA,
      *Plaintiffs-Appellants (05-5097)/*
      *Cross-Appellees,*


      *v.*


ALLAN H. FINE; MARTIN L. FINE; STEVEN R. FINE
(05-5104); MIRIAM FINE GELLAR; STEVEN L. FINE
(05-5101); PREFERRED HEALTH PLAN, INC. (05-
5103),

      *Defendants-Appellees/*
      *Cross-Appellants.*

Nos. 05-5097/5101/5103/5104

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 02-00264—Charles R. Simpson III, District Judge.

Argued: February 1, 2006

Decided and Filed: April 13, 2006

Before: RYAN, CLAY, and GILMAN, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** David L. Leightty, LEIGHTTY & ASSOCIATES, Louisville, Kentucky, for
Appellants. Robert W. Bishop, BISHOP & ASSOCIATES, Louisville, Kentucky, David Domene,
BLACKBURN, HUNDLEY & DOMENE, Louisville, Kentucky, William D. Roberts, HALL,
RENDER, KILLIAN, HEATH & LYMAN, Louisville, Kentucky, for Appellees. **ON BRIEF:**
David L. Leightty, LEIGHTTY & ASSOCIATES, Louisville, Kentucky, for Appellants. Robert W.
Bishop, BISHOP & ASSOCIATES, Louisville, Kentucky, David Domene, BLACKBURN,
HUNDLEY & DOMENE, Louisville, Kentucky, William D. Roberts, A. Courtney Guild, Jr., Jay
P. Turner, HALL, RENDER, KILLIAN, HEATH & LYMAN, Louisville, Kentucky, for Appellees.

GILMAN, J., delivered the opinion of the court, in which CLAY, J., joined. RYAN, J. (p.
19), delivered a separate concurring opinion.

1

---

**OPINION**

---

RONALD LEE GILMAN, Circuit Judge. Five former employees of the M. Fine & Sons Manufacturing Co., Inc. (the Company) filed this putative class-action lawsuit against five of the Company's former officers and directors (collectively, the Fines), as well as the third-party administrator of the Company's healthcare plan, Preferred Health Plan, Inc. (PHP). The plaintiffs alleged that the defendants violated their fiduciary duties imposed by the Employment Retirement Income Security Act (ERISA) and committed various torts under Kentucky law.

Specifically, the plaintiffs maintain that the Fines and PHP (1) failed to disclose to the employees that the Company was in dire financial straits and was therefore unable to make the payments necessary to support the Company's healthcare plan, and (2) failed to devise a means of assuring adequate financing for the plan. They also allege that PHP improperly allocated plan assets to itself after the plan ceased operation and PHP's administration contract had terminated.

In granting summary judgment in favor of the defendants on the ERISA claims, the district court concluded that neither the Fines nor PHP were ERISA fiduciaries within the meaning of the statute. The district court also initially dismissed the plaintiffs' pendent state-law claims with prejudice, but, after a motion for reconsideration, changed the dismissal to one without prejudice. On appeal, the plaintiffs maintain their argument that the Fines and PHP were ERISA fiduciaries, and that they breached their duties during the months preceding the Company's bankruptcy. Both the Fines and PHP, on the other hand, cross-appeal the district court's decision to dismiss the plaintiffs' pendent state-law claims without prejudice, as opposed to with prejudice, arguing that those claims are preempted by ERISA.

For the reasons set forth below, we (1) agree with the district court that the Fines were not ERISA fiduciaries, (2) conclude that the district court erred in ruling that PHP was not an ERISA fiduciary with respect to the assets of the Company's healthcare plan over which PHP had control, and (3) hold that all but one of the plaintiffs' state-law claims are preempted by ERISA. We therefore **AFFIRM** the grant of summary judgment in favor of the Fines; **AFFIRM** the dismissal of the plaintiffs' state-law claims, but order that all but the one claiming that the Fines breached a duty by failing to disclose the overall financial condition of the Company be dismissed with prejudice; **REVERSE** the grant of summary judgment in favor of PHP; and **REMAND** the case for further proceedings consistent with this opinion.

## I.  BACKGROUND

### A.    Factual background

M. Fine & Sons Manufacturing Co., Inc. was a manufacturer of clothing products, with its principal place of business in Louisville, Kentucky. During the mid-1990s, the Company owned additional facilities in Georgia, Honduras, Indiana, Kentucky, and Tennessee, although these facilities began to close as the Company's financial condition deteriorated. Faced with decreased demand for its products and with increased operating costs, the Company hired Gary Finkel as its Chief Operating Officer in 1999. Finkel was asked "to turn the situation around, to increase sales, decrease costs, [and] therefore increase profitability." Despite Finkel's efforts, the Company's financial slide continued. It lost $4.7 million in 1999.

One of the cost-saving measures implemented by Finkel was the change from a fully insured healthcare plan with Anthem Blue Cross/Blue Shield to a self-insured plan administered by PHP. The Company initiated the new plan by entering into an "Administrative Services Agreement"

(Agreement) with PHP on August 1, 1999. Under the Agreement, PHP was named as both "a Third Party Administrator" responsible for "certain supervisory, administrative and general management services," and as the "Plan Administrator," thereby acquiring "certain legal responsibilities as defined by the Internal Revenue Code and ERISA." PHP now maintains that its designation as the "Plan Administrator" was an error that was later corrected in what it calls the "Plan Document," a form used by PHP and customized to establish the benefits that the Company sought to provide its employees and the eligibility requirements for the receipt of those benefits.

In contrast to the Administrative Services Agreement, the Plan Document listed the Company as the administrator of the plan and stated that the plan was to be administered through the Company's human resources office. Kim Lassiter, the vice president of human resources, was the only Company official to sign the initial Plan Document and the amendments to that document implemented in July of 2000 and March of 2001. The Plan Document also listed the Company as the "named fiduciary," and described PHP as the "plan supervisor" to whom all claims and questions regarding claims should be directed. Employees were informed, however, that they could appeal the denial of their claim directly to the Company, whose decision as to eligibility and coverage would be final.

As the supervisor of the plan, PHP performed a variety of tasks, including processing claims, determining coverage and eligibility, and making payments to eligible employees. In a typical case, PHP would receive a claim from a healthcare provider, process that claim to determine whether it was covered by the Company's plan, and, if the claim was covered, PHP would advise the Company on a weekly basis of the money that needed to be deposited into the account from which PHP paid the service providers. That account, which was in the names of both the Company and PHP, was financed from the general assets of the Company and had no minimum balance, such that the account was designed to "zero out" after PHP dispersed the designated set of payments. In addition to its claims-handling responsibilities, PHP was charged with enrolling Company employees in the self-funded plan, a task that it continued to perform through March of 2001, at which time the Company became unable to meet its obligations under the plan.

The role of the Company's directors in the administration of the plan is less apparent. All of the Fines were shareholders and members of the board of directors at some point, although Steven Fine was removed from the board when Gary Finkel was hired as CEO in 1999. Finkel, in turn, replaced the three Fines who had acted as co-presidents and co-CEOS from 1989 until Finkel was hired. According to the plaintiffs, the Fines became aware in mid-2000 that the Company was suffering from cash-flow problems and was late in making critical payments. Four of the Fines sought to improve the situation by loaning the Company a total of $1.5 million in capital.

By the spring of 2001, the Company's fragile financial condition was evident, and the board of directors authorized management to use as capital the cash value (some $750,000) of life insurance policies owned by the Company. A new severance plan, which markedly reduced severance benefits to discharged employees, was promulgated a few days later. At around the same time, the Company stopped making the payments required to support the healthcare plan, and PHP was unable to write checks payable from the plan account. Retaining for itself an administrative fee of $5,793.40, PHP cancelled its contract with the Company in a letter dated May 17, 2001. PHP then sent a final letter to the Company on June 6, 2001, including in that correspondence checks that remitted the balance on hand of COBRA payments made by individuals directly to PHP ($2,849.30) and the remaining funds in the plan account ($2,036.99). The Company filed for bankruptcy later that month.

Among those adversely affected by the Company's decline and eventual bankruptcy were the five plaintiffs, all of whom were either current or former employees at the time the Company ceased operations. The plaintiffs became eligible for healthcare benefits in three different ways.

Lead plaintiff William "Jack" Briscoe was an hourly employee whose contributions to the self-funded plan were deducted from his wages of $9.70 per hour.  Briscoe signed up for the self-funded plan when he was asked to do so by PHP in March of 2001.  On the other hand, plaintiffs Laura Farley, Lawrence Smith, and Michael Straka were all salaried employees whose contributions to the plan were paid by the Company as partial compensation for their work.  Finally, Harold Smith, who had left the Company pursuant to a severance agreement prior to the Company's bankruptcy, made individual COBRA payments directly to PHP through April of 2001.  Unpaid medical bills for these employees ranged from $89 to $30,000, with the total amount of bills left unpaid upon the Company's demise exceeding $300,000.

## B.       Procedural background

The plaintiffs filed their complaint in the district court in 2002, naming as defendants the five members of the Fine family and PHP.  Alleging violations of various fiduciary duties imposed by ERISA as well as several common-law torts, the plaintiffs sought to certify a class of Company employees and requested both compensatory and punitive damages.  After discovery had commenced, the plaintiffs agreed to a voluntary dismissal of most of the common-law torts alleged in their original complaint.  They then filed an amended complaint that restated their ERISA claims and their state-law claims of fraud, misrepresentation, concealment, and conversion.  All of the defendants moved for summary judgment, arguing that they were not ERISA fiduciaries and that the plaintiffs' state-law claims were preempted by ERISA.

The district court granted summary judgment in favor of the defendants.  Framing the dispositive issue as whether the Fines and PHP qualified as fiduciaries under ERISA, the district court concluded that the Fines had no responsibility for the administration of the plan and that PHP, even if it had discretionary authority over certain aspects of the healthcare plan, did not have such authority or responsibility with respect to the actions that allegedly harmed the plaintiffs.  As to the plaintiffs' state-law claims, the district court declined to exercise supplemental jurisdiction.  It then entered an order dismissing all claims against the defendants with prejudice.

In response to the district court's order, the plaintiffs filed a motion to amend the judgment, arguing that only the federal claims should be dismissed with prejudice and that the state-law claims should be permitted to proceed in state court.  All of the defendants opposed the motion, insisting that the plaintiffs' state-law claims were either preempted by ERISA or failed to state a claim upon which relief could be granted.  The district court granted the plaintiffs' motion, amending its earlier order and dismissing the plaintiffs' state-law claims without prejudice.  Following the amended order, the plaintiffs refiled these claims in state court.  The defendants then removed the refiled case to federal court.  Proceedings in that case have been stayed pending the outcome of this appeal.

## II.  ANALYSIS

## A.       The district court correctly concluded that the Fines were not ERISA fiduciaries

### 1.       *Standard of review*

The district court's grant of summary judgment is reviewed de novo.  *Int'l Union v. Cummins, Inc.*, 434 F.3d 478, 483 (6th Cir. 2006).  Summary judgment is proper where there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In considering a motion for summary judgment, the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  We view the facts, and any inferences drawn therefrom, in the light

most favorable to the nonmoving party, which in the present case is the plaintiffs. *See Melson v. Prime Ins. Syndicate, Inc.*, 429 F.3d 633, 636 (6th Cir. 2005).

## 2.     *Statutory framework*

Because the district court granted summary judgment in favor of the defendants on the ground that they were not ERISA fiduciaries, we will briefly review the role that fiduciary status plays in the ERISA remedial scheme.  As defined in the statute,

> a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).  The allegations of the plaintiffs in the present case implicate clauses (i) and (iii) of this statutory definition.

This court employs a functional test to determine fiduciary status.  *See Hamilton v. Carell*, 243 F.3d 992, 998 (6th Cir. 2001) (observing that "[t]he Supreme Court has recognized that ERISA 'defines "fiduciary" not in terms of formal trusteeship, but in functional terms of control and authority over the plan . . .'") (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993)).   In addition, several courts have focused on the phrase "to the extent" in holding that "[f]iduciary status . . . is not an all or nothing concept," and that they must therefore "ask whether a person is a fiduciary with respect to the particular activity in question." *Moench v. Robertson*, 62 F.3d 553, 561 (3d Cir. 1995) (citations and quotation marks omitted); *see also Hamilton*, 243 F.3d at 998 (explaining "the need to examine the conduct at issue when determining whether an individual is an ERISA fiduciary"); *Am. Fed'n of Unions Local 102 v. Equitable Life Assurance Soc'y*, 841 F.2d 658, 662 (5th Cir. 1988) ("A person is a fiduciary only with respect to those portions of a plan over which he exercises discretionary authority or control.").

Fiduciary status is the key to unlocking ERISA's civil-enforcement scheme because the statute permits a suit "by the Secretary [of Labor], or by a participant, beneficiary or fiduciary for appropriate relief under [29 U.S.C. § 1109]." 29 U.S.C. § 1132(a)(2).  Section 1109, in turn, makes any person found to be a fiduciary personally liable to the ERISA-covered plan for any damages caused by that person's breach of fiduciary duties.  *See also Mertens*, 508 U.S. at 252-54 (explaining the remedies available against fiduciaries under 29 U.S.C. § 1109 and the more limited remedies available against nonfiduciaries under § 1132(a)(3)).  Plaintiffs seeking more than the "appropriate equitable relief" available under § 1132(a)(3)—of which injunctions and restitution are two examples, *see Mertens*, 508 U.S. at 255—thus must demonstrate that the person violating a duty imposed by ERISA is a fiduciary.  Whether a person or entity qualifies as a fiduciary is either a question of law or a mixed question of law and fact, both of which we review de novo.  *See Hamilton*, 243 F.3d at  997 (explaining that fiduciary status is a pure question of law where the parties do not challenge the district court's underlying factual findings).

## 3.     *The Fines did not exercise discretionary authority regarding the administration of the plan or any control over the assets of the plan*

Citing *Leigh v. Engle*, 727 F.2d 113 (7th Cir. 1984), the plaintiffs argue that the Fines "were functional fiduciaries because they selected and retained the plan administrators." The district court, relying in part on an interpretative Bulletin from the Department of Labor (DOL), rejected the plaintiffs' contention.  According to the DOL Bulletin, "[m]embers of the board of directors of an

employer which maintains an employee benefit plan will be fiduciaries only to the extent that they have responsibility for the functions described in section 3(21)(A) of the Act." DOL Interpretative Bulletin 75-8, 29 C.F.R. § 2509.75-8, at D-4. The Bulletin gives as an example directors who choose a named or functional fiduciary of a covered plan, but notes that the directors' liability would be limited to claims relating to the selection and retention of those fiduciaries. *Id.*

Appellate courts interpreting the DOL Bulletin have taken different approaches to the situation in which a corporation is the named fiduciary, but has not explicitly delegated administrative authority to its corporate directors. The Sixth Circuit has not yet squarely faced this issue. *See In re CMS Energy ERISA Litig.*, 312 F. Supp. 2d 898, 907 (E.D. Mich. 2004) (observing that "the Sixth Circuit has yet to address [the Third Circuit's ruling] that officers are not deemed ERISA fiduciaries in the absence of express individual discretionary authority for plan administration"). In *Confer v. Custom Engineering Co.*, 952 F.2d 34 (3d Cir. 1991), the Third Circuit held that "when an ERISA plan names a corporation as a fiduciary, the officers who exercise discretion on behalf of that corporation are not fiduciaries . . . unless it can be shown that these officers have *individual* discretionary roles as to plan administration." *Id.* at 37 (emphasis in original).

Two other circuits, however, have purported to disagree with the breadth of the holding in *Confer* and have reiterated that the functions performed by a corporate director determine that person's status as a fiduciary. *See Kayes v. Pacific Lumber Co.*, 51 F.3d 1449, 1459-61 (9th Cir. 1995) (rejecting the analysis from *Confer* "[i]nsofar as [that case] holds that a corporate officer or director acting on behalf of a corporation is not acting in a fiduciary capacity if the corporation is the named plan fiduciary"); *Musmeci v. Schwegmann Giant Super Mkts., Inc.*, 332 F.3d 339, 350 (5th Cir. 2003) (confirming that the Fifth Circuit follows the "functional approach" adopted in *Kayes*).

Although the Ninth Circuit expressed its disagreement with *Confer*, we do not interpret the approach that it adopted in *Kayes* as substantially different from the one employed by the Third Circuit. Specifically, both courts would permit a finding that the officers of a corporation named as the fiduciary of its healthcare plan are themselves fiduciaries where they exercise discretionary authority over plan assets or plan management. *See Kayes*, 51 F.3d at 1459 (reiterating that "corporate officers [can] be liable as fiduciaries on the basis of their conduct and authority with respect to ERISA plans"); *Confer*, 952 F.2d at 37 n.3 (acknowledging that "officers of a corporation may assume a fiduciary status, even absent a designation as the named fiduciary or trustee of the plan, by performing functions that fulfill the statutory definition of fiduciary") (quotation marks omitted). The primary difference between the two decisions, then, is that the Third Circuit appears to begin with a rebuttable presumption against director or officer fiduciary liability under ERISA, whereas the Ninth Circuit starts with no initial presumption one way or the other.

Because the analyses employed in *Confer* and *Kayes* lead to the same result in the present case, we have no need to take a position on which approach is more faithful to ERISA's definition of a fiduciary. As the district court correctly found, the plaintiffs have not pointed to any evidence in the record indicating that the individual directors made any decisions with respect to plan management or the collection or distribution of plan assets (which were a subset of the Company's general assets). The only relevant decisions that the directors took part in making are of the type addressed by the DOL Bulletin and by the Seventh Circuit in *Leigh*—the hiring of PHP as the third-party administrator and the assignment of plan management to the department of human resources. Both *Leigh* and the DOL Bulletin, however, limit the responsibility of directors to the obligations that arise from their specific fiduciary acts. *See Leigh*, 727 F.2d 134-35; 29 C.F.R. § 2509.75-8, D-4. In the present case, the actions by the Fines that the plaintiffs allege constitute a breach of duty are wholly separate from the selection of PHP as the third-party administrator and the delegation of plan management to the human resources department. That is to say, the only acts by the Fines that

could give rise to fiduciary liability are ones that the plaintiffs do *not* allege comprise a breach of duty.

Regardless of whether the more lenient functional approach from *Kayes* or the more demanding *Confer* standard applies, the plaintiffs have not demonstrated that the Fines exercised the type of discretionary authority identified in § 3(21)(A) of ERISA. They have not shown, for example, that the Fines' "conduct and authority with respect to [the] ERISA plan[]" involved discretionary acts, *Kayes*, 51 F.3d at 1459, or that the Fines undertook "*individual* discretionary roles as to plan administration." *Confer*, 952 F.2d at 37 (emphasis in original). Because the plaintiffs do not argue that the limited discretionary acts of the Fines gave rise to a breach of duty and because the Fines did not exercise discretionary authority over any other aspects of plan management or plan assets, the district court correctly concluded that the Fines were not ERISA fiduciaries. And because they were not fiduciaries, the Fines did not owe the plaintiffs the significant duties that our cases place upon such persons. *See, e.g.*, *Krohn v. Huron Memorial Hosp.*, 173 F.3d 542, 547 (6th Cir. 1999) (explaining an ERISA fiduciary's duty of loyalty and duty to disclose pertinent information to plan participants). The district court therefore properly granted summary judgment in favor of the Fines.

**B.       PHP exercised sufficient control over plan assets to qualify as a fiduciary**

We cannot give the same answer regarding PHP's status as an ERISA fiduciary. Once again, our inquiry is a functional one, with the task being to determine whether PHP exercised *discretionary* authority over plan management, or *any* authority or control over plan assets. *See* 29 U.S.C. § 1002(A)(21); *see also Hamilton*, 243 F.3d at 998 ("Only discretionary acts of plan management or administration, or those acts designed to carry out the very purposes of the plan, are subject to ERISA's fiduciary duties."). Although the functions that PHP performed as a third-party administrator did not convert it into an ERISA fiduciary, we believe that PHP exercised sufficient control over plan assets to so qualify.

### 1.       *Neither its agreement with the Company nor its day-to-day operations made PHP an ERISA fiduciary*

PHP renews the argument that it made before the district court—that it engaged solely in administrative and ministerial tasks that did not involve the exercise of discretionary authority. Relying on the DOL Bulletin and this court's decision in *Baxter v. C.A. Muer Corp.*, 941 F.2d 451 (6th Cir. 1991) (per curiam), PHP maintains that the tasks it performed are directly in line with those that the Department of Labor and this court have held do not give rise to fiduciary responsibilities. This court in *Baxter* summarized the DOL Bulletin by explaining "that a person without the power to make plan policies or interpretations but who performs purely ministerial functions such as processing claims, applying plan eligibility rules, communicating with employees, and calculating benefits, is not a fiduciary under ERISA." *Id.* at 455. The plaintiff in *Baxter* alleged that the third-party administrator of his employer's self-funded healthcare plan had breached its fiduciary duties when it denied him benefits after he was involved in a car accident caused by his intoxication. *Id.* at 452. Citing with approval the Eleventh Circuit's decision in *Baker v. Big Star Division of the Grand Union Co.*, 893 F.2d 288 (11th Cir. 1989) (holding that a third-party plan administrator was not a fiduciary where the employer reserved the right to review the denial of claims), this court held that the third-party administrator was "merely a claims processor that pays claims in accordance with the terms of the [employer's] plan" and therefore did not qualify as an ERISA fiduciary. *Baxter*, 941 F.2d at 456.

Similarly, PHP operated pursuant to an administrative services agreement that conferred upon it the responsibility for determining eligibility for benefits, processing claims, and assisting the plan administrator in producing reports required by federal and state law. Its tasks appear to be

identical to the ones that the *Baxter* court held were insufficient to convert a third-party administrator into an ERISA fiduciary. *See* 941 F.2d at 455; *see also Gelardi v. Pertec Computer Corp.*, 761 F.2d 1323, 1325 (9th Cir. 1985) (per curiam) (holding that a company hired by an employer to administer its employee-benefits plan was not a fiduciary because it preformed "only administrative functions, processing claims within a framework of policies, rules, and procedures established by others"). Also as in *Baxter*, the Company as the plaintiffs' employer retained the final authority to determine whether a claim should be paid and was the entity to which dissatisfied employees were instructed to direct their appeal of a claim denial. *See Baxter*, 941 F.3d at 455.

The plaintiffs, in response, cite three cases from this circuit where the court did not exclude the possibility that third-party administrators could be fiduciaries. In the first, *Libbey-Owens-Ford Co. v. Blue Cross & Blue Shield Mutual of Ohio (BCBSM)*, 982 F.2d 1031, 1034-35 (6th Cir. 1993), this court held that BCBSM retained its status as a fiduciary even after Libbey-Owens-Ford switched from a BCBSM-insured plan to a self-funded plan. But the court limited its holding to the situation in which "an insurance company administers claims for an employee welfare benefit plan and has authority to grant or deny the claims . . . ." *Id*. at 1035. In that case BCBSM maintained complete control over the claims decisions, including appeals from the denial of benefits. *Id.*

The Seventh Circuit in *Klosterman v. Western General Management, Inc.*, 32 F.3d 1119, 1125 (7th Cir. 1994), emphasized BCBSM's role as the final authority in claims decisions when it refused to extend the holding of *Libbey-Owens-Ford* to a case (like here) in which the sponsoring company was the ultimate decisionmaker. This reasoning also distinguishes the second precedent on which the plaintiffs rely, *Hill v. Blue Cross & Blue Shield of Michigan*, 409 F.3d 710, 716-17 (6th Cir. 2005), where this court simply applied *Libbey-Owens-Ford* at the motion-to-dismiss stage and allowed a claim against the insurance company to proceed because the plaintiff alleged that Blue Cross had full authority to grant and deny claims.

*Six Clinics Holding Corp., II v. Cafcomp Systems, Inc.*, 119 F.3d 393, 401-402 (6th Cir. 1997), is the third and final Sixth Circuit case relied on by the plaintiffs in their claims against PHP. This court in *Six Clinics* held that a third-party administrator that provided services as part of the clinic's employee-cafeteria plan qualified as an ERISA fiduciary. In so holding, the court focused on (1) the permissive language of the administrative services agreement (which included phrases such as "in the judgment of Cafcomp" and "as Cafcomp deems necessary"), (2) the fact that Cafcomp held itself out as a fiduciary in promotional materials, and (3) Cafcomp's ability to unilaterally amend the plan to bring it into compliance with federal law. *Id*. at 402. None of these three factors exist in the present case.

PHP's administrative services agreement features only one broad authorization clause, and even that clause limits what PHP may do to carrying out "the terms and purposes of [the] Agreement." As for the second *Six Clinics* factor, whatever ambiguity the administrative services agreement might have generated regarding the identity of the plan administrator, the employees learned of PHP's role not through that agreement, but through the Plan Document. That document lists the Company as the plan administrator and named fiduciary, and lists PHP as the plan supervisor and the entity that will aid in claims processing. Finally, nothing in the administrative services agreement or the Plan Document empowered PHP to make unilateral modifications to the plan. This court's decision in *Six Clinics*, therefore, does not control the outcome in the present case.

We therefore agree with PHP that neither the terms of its agreement with the Company nor its day-to-day operations gave PHP discretionary authority over plan management. *See Flacche v. Sun Life Assurance Co. of Can.*, 958 F.2d 730, 734 (6th Cir. 1992) ("The mere payment of claims is insufficient to give Sun Life discretionary control over the management of plan assets or the

administration of the plan."). Absent such authority, PHP falls within the safe harbor provided by the DOL regulation and does not qualify as an ERISA fiduciary on that basis. As we explain below, however, PHP's unilateral disposition of funds held in an account over which it exerted control makes it a fiduciary to the extent that it exercised such control upon the termination of its relationship with the Company.

### 2.    *PHP qualifies as an ERISA fiduciary to the extent that it exercised control over plan assets*

The plaintiffs challenge the district court's conclusion that PHP did not control plan assets because its tasks were limited to collecting COBRA payments from former employees and paying out claims approved by the Company. Specifically, the plaintiffs maintain that the manner in which PHP disposed of the remaining funds in the plan bank account—by keeping some of the money as an administrative fee and returning the rest of the money to the bankrupt Company— is "inconsistent with the limited discretionary authority found by the [d]istrict [c]ourt." We believe that both the parties and the district court misunderstood what must be shown in order to establish that an entity controlling the assets of an ERISA-covered plan qualifies as a fiduciary.

Under the statutory definition, a person is a fiduciary for purposes of ERISA "to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . . ." 29 U.S.C. § 1002(21)(A); *see also Seaway Food Town, Inc. v. Medical Mut. of Ohio*, 347 F.3d 610, 616 (6th Cir. 2003) (explaining that "ERISA defines a 'person' to include a corporation") (citation and quotation marks omitted). The plain language of the statute establishes that it imposes fiduciary duties not only on those entities that exercise *discretionary* control over the disposition of plan assets, but also imposes such duties on entities or companies that exercise "*any* authority or control" over the covered assets. *See Smith v. Provident Bank*, 170 F.3d 609, 613 (6th Cir. 1999) (emphasizing the same statutory language in holding that a bank removed as trustee of an account acted as an ERISA fiduciary after its removal because it still "exercised control over plan assets").

The district court therefore erred in requiring, as a condition of fiduciary responsibility, that the type of authority that PHP exercised over the plan assets had to be "discretionary." This confusion stems from the differing language in two adjacent clauses of ERISA's definition of "fiduciary." Under one clause, a person is a fiduciary to the extent that he or she "exercises any *discretionary* authority or *discretionary* control" over the management of the ERISA plan. 29 U.S.C. § 1002(21)(A)(i) (emphasis added). The second part of the same sentence, however, confers fiduciary status upon a person to the extent that he or she "exercises *any* authority or control respecting management or disposition of [the plan's] assets." *Id.* (emphasis added). We will presume under prevailing canons of statutory construction that Congress's omission of the word "discretionary" in the second part of the sentence was intentional, and that the threshold for acquiring fiduciary responsibilities is therefore lower for persons or entities responsible for the handling of plan assets than for those who manage the plan. *See, e.g.*, *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) ("[W]here Congress includes particular language in one section of a statute but omits it in another . . . , it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (alteration in original) (citation and quotation marks omitted).

Our interpretation of 29 U.S.C. § 1002(21)(A)(i) mirrors the one recently adopted by the D.C. Circuit in *Chao v. Day*, 436 F.3d 234, 236 (D.C. Cir. 2006). The defendant in *Chao*, an insurance company president named Brittian Day, was accused of selling fake insurance plans to clients and then depositing their payments into his corporate account. *Id.* at 235. Day filed a motion to dismiss the Secretary of Labor's suit against him, arguing that he was not a fiduciary under

ERISA because the plain language of 29 U.S.C. § 1002(21)(A)(i) required the Secretary to prove that Day exercised *discretionary* control over the relevant assets.

The D.C. Circuit rejected Day's argument, commenting that such a reading "does violence to the statutory text." *Id.* at 236. Emphasizing both Congress's use of the disjunctive term "or" to separate the two clauses in question and the omission of the word "discretionary" in the second clause, the D.C. Circuit held that a person who controls plan assets acquires fiduciary responsibility regardless of whether that control is discretionary. *Id.* ("Because the disposition clause contains no 'discretion' requirement, it is irrelevant whether Day exercised 'discretion' in his thievery. '[A]ny authority or control' is enough."); *see also David P. Coldesina, D.D.S. v. Estate of Simper*, 407 F.3d 1126, 1132 (10th Cir. 2005) (holding that the distinction between the two clauses "evidences Congress's intent to treat control over assets differently than control over management or administration"); *FirsTier Bank, N.A. v. Zeller*, 16 F.3d 907, 911 (8th Cir. 1994) (holding that ERISA imposes fiduciary duties "whenever one deals with plan assets").

We believe that the plaintiffs have proffered sufficient evidence to demonstrate that PHP exercised control over the assets of the Company's healthcare plan still in PHP's possession when the Company became insolvent. This court's decision in *Smith* is illustrative. In that case, a participant in ERISA-covered pension and profit-sharing plans instructed the defendant bank, which was the trustee for the plans, to purchase 1,000 shares of stock on his behalf. 170 F.3d at 612. Two weeks after the bank was removed as trustee for the plan, the bank corrected its failure to purchase the same amount and type of stock for another client by removing the previously bought shares from the participant's account. *Id.* Although the value of those shares had increased substantially in the intervening period, the bank credited the participant's account only for the original purchase price of the stock, minus dividends that the participant had already received. *Id.* In deciding whether the participant's state-law claim for breach of fiduciary duty was preempted, this court held that the bank acted as an ERISA fiduciary when it removed the shares from the participant's account. *Id.* at 613. The bank retained its fiduciary status even after being removed as trustee because it still "exercised control over plan assets" by removing such assets from a participant's account and then replacing those assets with a monetary sum of lesser value. *Id.*

Similarly, PHP still controlled plan assets after the formal conclusion of its relationship with the Company and with the plan participants. Documents in the record demonstrate that PHP terminated its contract with the Company on May 17, 2001, by which time PHP had already removed from the plan account its administrative free of $5,793.40. PHP continued to receive COBRA payments from plan participants and controlled a small amount of funds previously received from the Company. On June 6, 2001, PHP sent a letter and two checks to the Company—one covering the amount of COBRA payments that it had received through May 23, and another "representing the funds remaining in the M. Fine & Sons, Inc. claim account." PHP of course knew by this time that the Company was in dire financial straits and was unable to fund the healthcare plan. Although PHP contends that its actions correspond to its obligations under clause 9.2 of its Agreement with the Company, these actions nonetheless refute the district court's conclusion that PHP was an ERISA fiduciary *only* with respect to the processing of healthcare claims. The terms of the Agreement may have limited PHP's *discretion* over the remaining funds, but did not affect its control over those funds. Because fiduciary status as to plan assets does not turn on the exercise of discretion or the existence of discretionary authority, *see Chao*, 436 F.3d at 236, the Agreement does not alter the fact that PHP acted as a signatory and unilaterally disposed of the remaining funds.

Caselaw from other circuits leads to the same conclusion. The Ninth Circuit's decision in *IT Corp. v. General Am. Life Ins. Co.*, 107 F.3d 1415, 1421 (9th Cir. 1997), for example, is factually analogous to the present case and specifically rejects the argument that limiting language in a contract between a company and its third-party administrator overrides the latter's functional status

as a fiduciary. IT Corp. had hired General American as the administrator of its ERISA plan. The parties signed a contract that assigned to General American the primary responsibility for processing and deciding all claims, instructed General American to direct all doubtful claims to IT Corp., and established that IT Corp. would set up a bank account with sufficient funds to cover the checks that General American would write in paying claims. *Id.* at 1417-18. Outside of these basic terms, the contract also limited General American's liability for any erroneous claims decisions and provided specifically that General American was not the named fiduciary of the plan and that its duties were purely ministerial in nature.

IT Corp. and several plan participants sued General American after it paid a $600,000 claim to a dependent child of an employee, a person not eligible for benefits under the company plan. *Id.* at 1418. After the district court granted General American's motion to dismiss on the ground that General American was not a fiduciary, the Ninth Circuit reversed. *Id.* at 1421-22. The court first addressed the issue of statutory construction, observing that ERISA "treats control over the cash differently from control over administration" by making any person or entity that exerts "[a]ny control over [the] disposition of plan money" a fiduciary. *Id.* at 1421. Under the statutory definition, the court reasoned, "[t]he right to write checks on plan funds is 'authority or control respecting management or disposition of its assets.'" *Id.* (quoting 29 U.S.C. § 1002(21)(A)(i)). The court then concluded that the contractual arrangement—under which IT Corp. established and funded a bank account and General American drew funds from that account—left a "substantial amount of money . . . under the control of General American, in the form of a bank account which it could deplete by writing checks." *IT Corp.*, 107 F.3d at 1421. Because the power to draft checks on the plan account constituted control over plan assets, General American qualified as an ERISA fiduciary.

The contractual arrangement between IT Corp. and General American is strikingly similar to the one between the Company and PHP in the present case. In both instances, a company hired a third-party administrator to perform ministerial tasks necessary to process claims, and also to pay those claims from a bank account established and funded by the company. Like General American, PHP had a "substantial amount of money" under its control at any given time, and exercised that control by depositing direct payments from COBRA participants, writing checks to cover approved claims, and allotting to itself a monthly administrative fee. PHP's actions evince more than just the power "to write checks on plan funds," *IT Corp.*, 107 F.3d at 1421, and suffice to show that PHP exercised at least partial control over the assets of the Company's healthcare plan.

Both the Second and Tenth Circuits have also held that parties who possess and use their power to write checks on a plan account exercise control over plan assets. *See LoPresti v. Terwilliger*, 126 F.3d 34, 40 (2d Cir. 1997); *David P. Coldesina, D.D.S.*, 407 F.3d at 1133-35. In *LoPresti*, two brothers were the sole shareholders of a company that funded its employees' benefit and pension plans by deducting a sum from the paychecks of the employees, placing that sum in its general assets, and then drawing funds from those assets to finance the plans. 126 F.3d at 37-38. The company used the employees' contributions to pay off other creditors after it suffered financial problems, leaving the plans without sufficient funds. Analyzing each brother separately, the Second Circuit held that one of the brothers qualified as an ERISA fiduciary because he signed checks on the company's account and decided which creditors to pay and when. *Id.* at 40. As to the other brother, he was not a fiduciary because, although he had power to write checks from the company account, he had not done so. *Id.* at 40-41.

More recently, the Tenth Circuit held that an accountant serving as the administrator of a dental office's employee-benefits plan qualified as an ERISA fiduciary because of his control over plan assets. *David P. Coldesina, D.D.S.*, 407 F.3d at 1133-35. The accountant took part in making disbursements to plan participants and also deposited funds into his business account before writing checks on behalf of the plan for insurance products and services. *Id.* at 1130, 1133. In concluding

that he was a fiduciary, the Tenth Circuit pointed to the accountant's "total control over the plan's money while it was in his account" and rejected his argument that he could not have been a fiduciary because he "was simply performing a ministerial, check-writing service." *Id.* at 1133-34. "[A]cting as a signatory on behalf of a plan," the court held, "can indicate fiduciary control," at least where a party both has the power to issue checks and exercises that power. *Id.* at 1133.

In the present case, PHP both had the power to write checks on the plan account (which was partially in PHP's name) and exercised that power before and after its contractual relationship with the Company ended. Because PHP exercised control over plan assets, it qualifies as an ERISA fiduciary to the extent that it did so.

We recognize that there is some tension between our decision today and the DOL regulation upon which PHP relies. Under the DOL regulation, a third-party administrator "without the power to make plan policies or interpretations but who performs purely ministerial functions such as processing claims, applying plan eligibility rules, communicating with employees, and calculating benefits, is not a fiduciary under ERISA." *Baxter*, 941 F.2d at 455 (quoting 29 C.F.R. § 2509.75-8, D-2). On the other hand, both our decision today and this court's earlier decision in *Smith* hold that any person or entity that exercises control over the assets of an ERISA-covered plan, including third-party administrators, acquires fiduciary status with regard to the control of those assets. *See Smith*, 170 F.3d at 613.

We believe that these two lines of authority are reconcilable. The decision in *Smith* is faithful to the plain language of 29 U.S.C. § 1002(21)(A)—as the vast majority of circuits to address the question have construed that language—and serves to clarify that a third-party administrator performing the tasks described in the DOL regulation can nevertheless acquire fiduciary status where, in addition to its other actions, it exercises control over plan assets. Like the D.C. Circuit, however, we wish to emphasize that our holding today is a limited one. Our reading of ERISA's statutory definition will not "extend fiduciary status to every person who exercises 'mere possession, or custody' over the plans' assets." *Chao*, 436 F.3d at 237; *see also Srein v. Frankford Trust Co.*, 323 F.3d 214, 222 (3d Cir. 2003) (recognizing that entities are not ERISA fiduciaries when they do "no more than receive deposits from a benefit fund on which the fund can draw checks") (citation and quotation marks omitted). To the contrary, our decision conforms with the statute's "purpose of assuring that people who have practical control over an ERISA plan's money have fiduciary responsibility to the plan's beneficiaries." *IT Corp.*, 107 F.3d at 1421.

The plaintiffs in the present case have presented competent evidence establishing that PHP exercised control over assets in the Company's self-funded plan by allotting to itself an administrative fee and returning the remaining funds after its relationship with the Company terminated. On these facts, we hold that PHP exercised at least partial control over plan assets and, to the extent that it did so, qualifies as a fiduciary. Whether PHP actually breached any duty that it owed is a question that the parties may address on remand and one on which we offer no opinion. We therefore reverse the district court's grant of summary judgment in favor of PHP and remand this aspect of the case for further proceedings.

**C.     All but one of the plaintiffs' state-law claims are preempted by ERISA and should have been dismissed with prejudice**

*1.     Jurisdiction*

The plaintiffs initially argue that this court lacks jurisdiction over the cross-appeal by the Fines and PHP. Specifically, they maintain that the defendants are attempting to appeal from the denial of summary judgment on the pendent state-law claims, and that the denial of summary judgment is not an appealable final order. Although the plaintiffs are correct that the denial of a motion for summary judgment is generally not a final order susceptible to appellate review, an

exception exists where the district court has dismissed pendent state-law claims without prejudice as opposed to with prejudice. 15A Wright, Miller & Cooper, Federal Practice and Procedure § 3914.6 (2d ed. 2002) (recognizing that "a defendant must be allowed to appeal a dismissal without prejudice in order to argue that the dismissal should have been with prejudice").

The Seventh Circuit, in two opinions written by Judge Posner, has applied and explained this dismissal-without-prejudice exception to the general appellate requirement of finality. In the earlier case of *LaBuhn v. Bulkmatic Transportation Co.*, 865 F.2d 119, 121-22 (7th Cir. 1988), the employer, in a suit alleging retaliatory discharge, appealed the district court's dismissal of the employee's suit without prejudice, arguing that the suit should have been dismissed with prejudice because the claim was preempted by the National Labor Relations Act. The Seventh Circuit held that it had jurisdiction over the appeal, reasoning that the defendant had been "aggrieved in a practical sense" because it "wanted a dismissal with prejudice, and didn't get it." *Id.* at 122.

In the later case of *Disher v. Information Resources, Inc.*, 873 F.2d 136, 137 (7th Cir. 1989), corporate officers accused by a former employee of breaching their fiduciary duties appealed the district court's dismissal of two pendent state-law claims without prejudice. Following *LaBuhn*, the Seventh Circuit in *Disher* agreed that it had jurisdiction over the appeal and held that "an order that ends litigation in one dispute-resolution system is final and appealable even though it kicks off litigation in another." *Id.* at 139; *see also Amazon, Inc. v. Dirt Camp, Inc.*, 273 F.3d 1271, 1275 (10th Cir. 2001) (stating that "where [a] dismissal finally disposes of the case so that it is not subject to further proceedings in federal court, the dismissal [without prejudice] is final and appealable").

The present case is procedurally on all fours with *LaBuhn*, *Disher*, and *Amazon*. When it dismissed the plaintiffs' pendent state-law claims without prejudice, the district court permitted the plaintiffs to refile in state court, an option they have in fact exercised. Litigation in state court has thus already "kick[ed] off." *See Disher*, 873 F.2d at 139. Moreover, like the defendants in *LaBuhn*, the Fines and PHP have been aggrieved because they sought dismissal with prejudice on preemption grounds, did not get it, and have now been forced to return to state court in order to remove the case back to federal court. *See also Amazon*, 273 F.3d at 1276 (noting that the defendant was "sufficiently aggrieved" because the dismissal without prejudice had given it "only a part of what it sought"). Because we find persuasive the caselaw permitting prevailing parties to appeal an order dismissing pendent state-law claims without prejudice in order to argue that the dismissal should have been with prejudice, we conclude that we have jurisdiction to hear the defendants' cross-appeal in the present case.

## 2.     *Standard of review*

Neither the briefs of the parties nor the caselaw that they cite have clarified the proper standard of review governing the defendants' cross-appeal. One the one hand, this court will overturn a district court's refusal to exercise supplemental jurisdiction and its decision to amend a prior judgment only if the lower court has abused its discretion. *See Soliday v. Miami County*, 55 F.3d 1158, 1164 (6th Cir.1995) (applying that standard to the district court's decision regarding supplemental jurisdiction); *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 374 (6th Cir.1998) (applying that standard to a motion to alter or amend judgment).

Characterizing this cross-appeal as a challenge to the district court's refusal to exercise supplemental jurisdiction, however, is itself questionable in light of the Supreme Court's cases holding that an ERISA-preemption defense essentially confers original jurisdiction upon the federal district court. *See Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 65-66 (1987) (holding that state-law causes of action falling within the scope of ERISA § 502(a) are completely preempted and removable to federal court); *see also Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 467-68 (6th Cir. 2002) (explaining that the "complete preemption" doctrine gives federal courts jurisdiction over

claims that would otherwise be cognizable only in state court). With respect to the underlying legal issue, this court reviews de novo the question of whether a state-law claim is preempted by ERISA. *See Nester v. Allegiance Healthcare Corp.*, 315 F.3d 610, 613 (6th Cir. 2003) ("[B]ecause the question of ERISA pre-emption of state law claims is one of law, it also is assessed *de novo*.").

We will assume without deciding that the abuse-of-discretion standard applies in these circumstances because we conclude that the district court's decision must be reversed in part under even the more deferential standard of review. Under that standard, we will reverse the district court only if we have "a definite and firm conviction that the trial court committed a clear error of judgment." *Eagles, Ltd. v. Am. Eagle Found.*, 356 F.3d 724, 726 (6th Cir. 2004) (quotation marks omitted).

> **3.      *All but one of the plaintiffs' state-law claims relate to the self-funded plan, do not stem from an independent legal duty, and are therefore subject to ERISA's broad preemption clause***

In addition to their ERISA-based claims against the Fines and PHP, the plaintiffs allege in their amended complaint that the Fines and PHP committed the torts of fraud, misrepresentation, and concealment, and that PHP committed the additional tort of conversion. These allegations stem from (1) the failure of the Fines to notify the plan beneficiaries of the Company's declining financial condition, (2) their failure to notify the beneficiaries of the Company's inability to fund the healthcare plan, (3) the failure of PHP to make the same type of disclosures, and (4) PHP's actions in extracting from the funds on hand its administrative fee and then transferring to the Company both COBRA payments that PHP had received from plan participants and the remaining balance of Company funds in the plan account. The defendants maintain that all of these causes of action are preempted by ERISA. We agree as to all but the first of the four claims set forth above.

Both the Supreme Court and this court have emphasized the broad scope of ERISA's "expansive pre-emption provision[] . . . ." *Aetna Health, Inc. v. Davila*, 542 U.S. 200, 208 (2004); *Cromwell v. Equicor-Equitable HCA Corp.*, 944 F.2d 1272, 1276 (6th Cir. 1991) (recognizing "that virtually all state law claims relating to an employee benefit plan are preempted by ERISA"). That provision, which is located at 29 U.S.C. § 1144, states that the ERISA remedial scheme "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" covered by the statute. *See Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96-97 (1983) ("A law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan.").

Because of the amorphous nature of the phrase "relate to," courts have struggled to establish generally applicable rules governing which state laws "relate to" or have a "connection with" employee-benefits plans. *See Penny/Ohlmann/Nieman, Inc. v. Miami Valley Pension Corp.*, 399 F.3d 692, 697 (6th Cir. 2005) (hereinafter *PONI*) (noting that the "Supreme Court has dealt with the 'opaque language in [ERISA's preemption clause]' approximately twenty times over the last twenty-four years"). We will not retrace the extensive history of that caselaw, but will instead summarize the most relevant principles and apply those principles to the facts of the present case.

To determine whether state-law claims "relate to" a covered plan, this court "consider[s] the kind of relief that plaintiffs seek, and its relation to the pension plan." *Ramsey v. Formica Corp.*, 398 F.3d 421, 424 (6th Cir. 2005); *see also Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444, 453 (6th Cir. 2003) (explaining that the preemption determination focuses "on the remedy sought by plaintiffs"). That methodology is still quite general, however, and this court has consequently endorsed an approach adopted by the Fourth Circuit, one in which that court identified three classes of state laws preempted by ERISA:

. . . ERISA preempts state laws that (1) mandate employee benefit structures or their administration; (2) provide alternative enforcement mechanisms; or (3) bind employers or plan administrators to particular choices or preclude uniform administrative practice, thereby functioning as a regulation of an ERISA plan itself.

*PONI*, 399 F.3d at 698 (quoting *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1468 (4th Cir. 1996) (quotation marks omitted); *see also David P. Coldesina, D.D.S.*, 407 F.3d at 1136 (recognizing, among four categories of laws preempted by ERISA, those "laws and common-law rules providing remedies for misconduct growing out of the administration of such plans").

This framework provides a more focused way of resolving the question of whether a state-law claim relates to plans covered by ERISA, marking a deviation from previous decisions of this court that evaluated the "reference to" and "connection with" prongs separately. *See, e.g.*, *Kentucky Ass'n of Health Plans, Inc. v. Nichols*, 227 F.3d 352, 358 (6th Cir. 2000) (analyzing separately each prong of the "relation to" test). Under the framework articulated in *PONI*, 399 F.3d at 698, if the plaintiffs' state-law claims of fraud, misrepresentation, and concealment against the Fines and PHP, and of conversion against PHP, fall into any one of the three *PONI* categories, they are preempted by ERISA and should have been dismissed with prejudice by the district court.

The Supreme Court's decision in *Aetna Health, Inc. v. Davila*, 542 U.S. 200 (2004), provides additional guidance on the breadth of ERISA preemption. In that case, two beneficiaries sued the administrators of their respective employers' healthcare plans under a Texas tort law that imposes liability on persons who fail to exercise ordinary care in making medical treatment decisions. *Id.* at 204-05. Both plaintiffs appealed the dismissal of their state-law claims to the Fifth Circuit, which held that the claims were not preempted because the Texas law did not duplicate the causes of action listed in ERISA. *Id.* at 206. The Supreme Court unanimously reversed, holding that "the preemptive force" of ERISA's remedial scheme was not "limited to the situation in which a state cause of action precisely duplicates a cause of action under ERISA § 502(a)." *Id.* at 216. Rather, the Court said, "any state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted." *Id.* at 209. Applying that broad view of preemption to the facts before it, the Court concluded that the plaintiffs brought "suit only to rectify a wrongful denial of benefits promised under ERISA-regulated plans, and [did] not attempt to remedy any violation of a legal duty independent of ERISA." *Id.* at 214.

This court has not yet issued an opinion discussing the impact of *Davila* on the preemption analysis. The decision in *PONI*, 399 F.3d at 698, and the framework adopted in that case, postdates *Davila* but does not cite the Supreme Court's opinion. Other circuits, however, have read the expansive language in *Davila* as holding that "when a state law claim may fairly be viewed as an alternative means of recovering benefits allegedly due under ERISA, there will be preemption." *Gresham v. Lumbermen's Mut. Cas. Co.*, 404 F.3d 253, 258 (4th Cir. 2005); *see also Prudential Ins. Co. of America v. National Park Med. Center*, 417 F.3d 897, 914 (8th Cir. 2005) (reading *Davila* as requiring the preemption of all suits brought under the Arkansas law in question if the suit "could have been brought under ERISA").

In our view, *Davila* applied and reaffirmed the principles established in the Supreme Court's previous preemption cases, and is fully consistent with the analysis employed by this court in *PONI*. We will therefore apply *PONI*, in addition to *Davila*, in determining whether the plaintiffs state-law claims against the Fines and PHP are preempted.

The plaintiffs allege that the Fines committed the torts of fraud, misrepresentation, and concealment by failing to disclose both the overall financial condition of the Company and the condition of the healthcare plan in particular. We conclude that the tort claims asserting that the

Fines failed to disclose the financial condition of the plan fall under the second of the three PONI categories. *See* 399 F.3d at 698 (holding that state laws providing "alternative enforcement mechanisms" are preempted). Perhaps most revealing is the manner in which the plaintiffs make these allegations in their amended complaint—they simply "incorporate[] by reference" the conduct that they claim violates ERISA and then state that such conduct "constitutes the torts of misrepresentation, fraud, and concealment."

But the plaintiffs have not pointed to "any violation of a legal duty independent of ERISA." *Davila*, 542 U.S. at 214. Any duty to disclose the financial condition of the plan that the Fines might have owed to the plan beneficiaries arose not out of an independent source of law, but out of the existence and nature of the plan itself, including any duties that the plan imposed on the officers and directors. *See id.* In other words, the plaintiffs' state-law claims against the Fines and PHP are simply a way of restating the claims for breach of fiduciary duty that they also allege under ERISA. The Supreme Court, however, has repeatedly refused to permit plaintiffs to "'elevate form over substance and [to] allow parties to evade' the pre-emptive scope of ERISA simply by 'relabeling their'" claims. *Id.* (quoting *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 211 (1985); *see also Smith v. Provident Bank*, 170 F.3d 609, 613 (6th Cir. 1999) ("Common law breach of fiduciary duty claims are clearly preempted by ERISA."). That the plaintiffs have captioned what is essentially a breach-of-fiduciary-duty claim as a suit for fraud, misrepresentation, and concealment does not alter the fact their state-law cause of action mirrors their federal claim under ERISA.

Nor does the distinction that the plaintiffs draw between "benefits as a measure of loss and benefits as the subject of the action" save their claims from preemption. Although the plaintiffs correctly point out that referring to plan benefits as a way "to articulate specific, ascertainable damages" does not necessarily mean that a claim is preempted, *Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444, 453 (6th Cir. 2003) (citation and quotation marks omitted), their reference to plan benefits is not what makes their claim "relate to" the self-funded plan. In *Marks*, this court held that state-law claims for breach of an employment contract, fraud, and misrepresentation were not *completely* preempted just because the plaintiff had sought an amount of damages equivalent to the benefits that he would have received under the plan. *Id.* This was so because Marks's state-law claims could be read as addressing his employer's efforts to retain his services and his employer's noncompliance with terms of the "employment contract irrespective of ERISA." *Id.* At the same time, the court acknowledged that Marks's fraud claims survived preemption only "[t]o the extent that [he] alleges that fraud or misrepresentation induced him to accept employment as an initial matter," *id.*, since any contention that the employer had defrauded him of plan benefits would "relate to" the plan and be subject to preemption.

All but one aspect of the fraudulent conduct alleged by the plaintiffs in the present case, on the other hand, is tied directly to the nature and existence of the Company's healthcare plan. Specifically, the plaintiffs maintain that the Fines failed to assure sufficient funding of the healthcare plan and, most importantly, that the Fines and PHP failed to inform the employees that the plan was underfunded. This much is evident from the plaintffs' acknowledgment that their claims of fraud, misrepresentation, and concealment are based on the defendants' failure to disclose the "desperate condition of M. Fine and the plan." Because any obligation that the defendants may have had to provide such information stems from the plan and not from an independent legal duty, the plaintiffs' state-law cause of action for failing to disclose the financial condition of the plan has "no basis whatsoever *but for* the ERISA plan," *Central States, Southeast & Southwest Areas Pension Fund v. Mahoning Nat'l Bank*, 112 F.3d 252, 256 (6th Cir. 1997) (emphasis added), and therefore serve as an "alternative enforcement mechanism." *PONI*, 399 F.3d at 698. This is true for both the Fines and PHP, the entity to which the Company delegated most of the plan's day-to-day operations. *See Smith*, 170 F.3d at 613 (explaining that state-law claims against a third party to whom a fiduciary delegated responsibility were preempted for the same reasons that claims against the fiduciary were

preempted).   Under these circumstances, the fraud, misrepresentation, and concealment claims alleging failure to disclose the financial condition of the plan are preempted.

We reach the opposite conclusion with respect to the claim that the Fines breached a duty by failing to disclose the overall financial condition of the Company.  *See, e.g.*, *Int'l Resources, Inc. v. New York Life Ins. Co.*, 950 F.2d 294, 300 (6th Cir. 1991) (holding that all but one of the plaintiffs' state-law claims were preempted by ERISA, and remanding for further proceedings on the surviving claim).  Unlike the other causes of actions discussed above, the plaintiffs could have alleged such a breach of duty even if the Company had never sponsored an ERISA-covered plan. In other words, this cause of action asserts a "violation of a legal duty independent of ERISA."  *See Davila*, 542 U.S. at 514.  The same is not true of the plaintiffs' analogous claims against PHP, an entity that would have had no relationship with the Company "but for the ERISA plan."  *See Central States, Southeast & Southwest Areas Pension Fund*, 112 F.3d at 256.  We therefore hold that the plaintiffs' claim against the Fines for failing to disclose the overall financial condition of the Company survives preemption and was properly dismissed without prejudice.  In so holding, however, we express no opinion whatsoever on the merits of that state-law claim.

The plaintiffs' conversion claim against PHP is also preempted by ERISA.  This court's decision in *Smith* is once again instructive.  As described in Part II.B.2. above, the plaintiff in *Smith* sued a bank and other financial companies under ERISA and state law after the defendants improperly removed stock from his pension account and replaced the stock with money of a lesser value.  170 F.3d at 612.  Among  the host of state-law claims was one for conversion.  This court held that the conversion claim was preempted, explaining that the plaintiff had "merely attach[ed] new, state-law labels to the ERISA claims for breach of fiduciary duty and recovery of benefits, for the apparent purpose of obtaining remedies that Congress has chosen not to make available under ERISA."  *Id.* at 615.  Any "remedy against the Plan fiduciaries lies with ERISA," the court said, "and substitute common law claims are preempted."  *Id.*; *see also LoPresti v. Terwilliger*, 126 F.3d 34, 41 (2d Cir. 1997) (holding that a "common law conversion claim . . . is nothing more than an alternative theory of recovery for conduct actionable under ERISA, and as such is preempted by ERISA") (citation and quotation marks omitted).

In the present case, the plaintiffs' conversion claim likewise overlaps with its claim for breach of fiduciary duty against PHP.  Both causes of action seek to hold PHP liable for how it dealt with the funds on hand at the end of its relationship with the Company.  The plaintiffs themselves describe their conversion claim as being based on "PHP's unilateral disposition of plan assets."  But remedies for a party's role in the misallocation of plan assets lie under ERISA.  *See Smith*, 170 F.3d at 615.  Because "ERISA's civil enforcement remedies were intended to be exclusive," *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 54 (1987), and because the plaintiffs' conversion claim against PHP relates to the distribution of plan assets, their claim is preempted and should have been dismissed with prejudice.  *See also id.* (noting that ERISA preemption would be ineffectual if injured parties "were free to obtain remedies under state law that Congress rejected in ERISA").

We must still decide whether the district court's decision to dismiss the pendent state-law claims without prejudice constituted an abuse of discretion.  The court's amended judgment and its refusal to exercise jurisdiction over the state-law claims led to the plaintiffs' refiling these claims in state court and a subsequent removal by the defendants back to federal court.  Although the district court entered its amended judgment prior to this court's decision in *PONI*, the district court had for its consideration the Supreme Court's then-recent opinion in *Davila*, as well as this court's earlier decisions in *Smith*, *Marks*, and *Central States, Southeast & Southwest Areas Pension Fund*. These authorities mandate the same result that we reach today, and lead us to conclude that the district court abused its discretion in amending its original order, thereby allowing all of the pendent state-law claims to be dismissed without prejudice.  *See United States v. Isaiah*, 434 F.3d 513, 519

(6th Cir. 2006) (stating that an appellate court will reverse under the abuse of discretion standard when the court is "left with a definite and firm conviction that the trial court committed a clear error of judgment") (citation and quotation marks omitted).  We therefore hold that the district court abused its discretion when it amended its previous judgment, causing us to remand the case with instructions to dismiss all but one of the plaintiffs' state-law claims with prejudice.

### III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the district court's grant of summary judgment in favor of the Fines; **AFFIRM** the dismissal of the plaintiffs' state-law claims, but order that all but the one claiming that the Fines breached a duty by failing to disclose the overall financial condition of the Company be dismissed with prejudice; **REVERSE** the grant of summary judgment in favor of PHP; and **REMAND** the case for further proceedings consistent with this opinion.

---

**CONCURRENCE**

---

RYAN, Circuit Judge, concurring. I agree that the Fines bear no fiduciary responsibility with respect to the plan because they did not exercise "any discretionary authority or discretionary control respecting management of such plan" or "any authority or control respecting management or disposition of its assets." *See* 29 U.S.C. § 1002(21)(A). The record shows that PHP exercised control over plan assets, and therefore, it had a fiduciary duty to plan participants to the extent that it exercised such control. *See id.*; *Smith v. Provident Bank*, 170 F.3d 609, 613 (6th Cir. 1999).

I also agree that the plaintiffs' state law tort claim against the Fines for failure to disclose to the plaintiff employees the desperate financial condition of the company is not preempted by ERISA because the Fines may have had a duty to disclose that information independent of ERISA and the terms of the plan, and therefore, failure to disclose that information may constitute a state law tort irrespective of the ERISA plan. *See Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444, 453 (6th Cir. 2003).

Finally, the district court erred when it dismissed without prejudice the plaintiffs' other state law claims. The court had original jurisdiction over those claims because they are preempted by ERISA § 514(a), 29 U.S.C. § 1144(a), and they could have been brought under ERISA § 502(a), 29 U.S.C. § 1132(a). *See Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 66 (1987).

I write separately only because my brother's very scholarly opinion says a good deal more than I wish to say.